# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| In re: | ) |
| | ) |
| SUN RIVER ENERGY, INC., | ) Case No.: 15-15610-MER |
| | ) Chapter 7 |
| Debtor. | ) |
| | ) |
| | ) |

## NOVA LEASING'S OBJECTION TO TRUSTEE'S MOTION TO APPROVE SETTLEMENT AGREEMENT BETWEEN TRUSTEE, DONAL R. SCHMIDT, SIERRA FOXTROT, L.P., AND JAMES E. PENNINGTON [#115]

Nova Leasing, LLC ("Nova"), by and through its attorneys, Allen & Vellone, P.C. and Volant Law, LLC, hereby objects to the Trustee's Motion to Approve Settlement Agreement Between Trustee, Donal R. Schmidt, Sierra Foxtrot, L.P., and James E. Pennington (the "Settlement") [Dkt. 115].

## Introduction

Donal R. Schmidt, Sierra Foxtrot, L.P., and James E. Pennington (the "Insiders") took control of Sun River, fleeced it of its liquid assets, embroiled it in a mess of litigation, fraudulently obtained a security interest in its most valuable illiquid asset, and then engineered a fraudulent conveyance of that asset to a creditor with whom the Insiders struck a sweetheart deal. They have no valid claim against the Estate. Yet, the Settlement provides the Insiders' with a **first priority** secured $3,000,000.00 claim.

This Settlement is inexplicable and unjustifiable. The Trustee has said the following about the Insiders:

- "From the documents reviewed to date, it appears that the Insiders negotiated both sides of the debt obligation. Schmidt, as CEO, executed the notes to Pennington and Wafford on behalf of the Debtor. Schmidt, as CEO and in his individual

1

- capacity, executed the mortgage as grantor and, as the principal of Sierra Foxtrot, LP, as grantee. Wafford, as COO, executed the note to Schmidt." [Dkt. 40, ¶ 13].

- "It also appears that at the time the purported debt to the Insiders arose (June 4, 2012), the Debtor had no ability to repay the obligation. In effect, the Insiders, in satisfaction of a purported employment dispute and while still employees of the Debtor and fiduciaries to its creditors and shareholders, negotiated a deal that gave them control over a corporate asset possibly worth in excess of $100 million in exchange for consideration that may range from nothing to no more than $5.5 million." [*Id*., ¶ 14].

- The Insiders "(a) elected not to defend a receivership action brought to enforce an approximately $250,000 debt against the company; (b) elected not to oppose a sale of the Property for a price that equaled approximately .25% of the Property's supposed value; and, (c) appeared in the action for the sole purpose of seeking to strike a creditor's objection to the sale. In other words, the Debtor, under the control of Wafford and Schmidt, consented by its silence to the disposition of the Property in a manner that inured entirely to the benefit of the Insiders and to the complete detriment of the Debtor's creditors and shareholders." [*Id*., ¶ 22].

- "[T]he Insiders have put their interests as purported creditors of the Debtor ahead of the interests of the Debtor's other creditors and shareholders in connection with the disposition of the Property. From the pleadings filed in these various cases, and the failures to act by the Debtor, it appears that the Insiders have acted at all times in a concerted effort to wrest control of the $100 million Property from the Debtor to the clear and certain detriment of the Debtor's creditors and shareholders. This course of conduct continues in the pending case." [*Id*., ¶ 27].

The Trustee was correct then and is incorrect now. The Settlement fails to meet the standard required for this Court's approval under the Bankruptcy Code, *i.e.*, the settlement must be fair and equitable and in the best interests of the Estate. The Settlement is not fair and equitable because it improperly elevates the Insiders' claims above other creditors of the Estate. Indeed, the Insiders' claims should be disallowed as fraudulent conveyances, or, at the very least, equitably subordinated. For these reasons, this Court should deny the Settlement in its entirety.

## Facts

The Insiders grossly mismanaged Sun River during the short time they chose to actively operate the company (from about August 2010 through February 2013). From April 2011

through January 2012 alone, Sun River incurred losses of $7.7 million. In the two-and-a-half years that they ran the company, the Insiders ensnared Sun River in multiple lawsuits brought by investors and vendors alleging fraud, breach of fiduciary duty, securities fraud, fraudulent transfers, and sundry other intentional torts. NASDAQ denied Sun River's listing application, citing allegations of stock price manipulation raised in four separate lawsuits.

Throughout this time, the Insiders engaged in various forms of self-dealing at Sun River's expense. For example, Sun River sold the hard minerals on the Colfax County, New Mexico property ("Colfax County Property") in 2012 for $500,000. This $500,000 transaction produced nearly all the revenue that Sun River enjoyed during its existence. Schmidt used some or all of the $500,000 for his personal use, including personal use of a privately owned jet. (*See* Affidavit of Richard Garza, attached as Exhibit A hereto).

In another example, Schmidt caused Sun River to walk away from its interest in a valuable and producing well, known as the Neal Heirs #2 well, and then caused another of his affiliated companies—known as Texokan Operating, Inc. ("Texokan")—to acquire an interest in that well for no paid consideration. (*Id*., ¶¶ 7-8). When another entity challenged Texokan's claimed interest, Schmidt asserted falsely that Sun River had conveyed to Texokan the well bore hole and the drilling equipment. (*Id*., ¶¶ 11-12). Pressed for proof, Schmidt produced an assignment of the well bore hole and bill of sale of the equipment, purportedly signed by Wafford. (Exhibit B and Exhibit C hereto). Wafford has inspected both of those documents and claims that he did not sign them (*See* Affidavit of Thimothy Wafford, attached as Exhibit D hereto) Since then, Schmidt has attempted to get Wafford to sign an affidavit attesting that he signed the forged documents, but Wafford has refused. (*Id.* at ¶ 8) Schmidt is currently being

investigated for these forgeries by Senior Investigator, Robin Landis, for the State Bar of Texas. (Exhibit A, ¶ 17)

In the most egregious example of self-dealing, the Insiders fraudulently conveyed a security interest in its largest asset, the Colfax County Property to themselves (the "Insiders' Transaction"). It is based on this fraudulent transaction that the Settlement proposes to give the Insiders a first-position $3,000,000 secured claim.

The Insiders claim that the purported debts owed to them arose in connection with settlements regarding their employment contracts with Sun River. The Insiders caused Sun River to grant them employment contracts for between $20,000 and $25,000 per month with no cash payments for the first year. These contracts were themselves issued as part of an insider transaction and do not represent market value for their respective services. Schmidt and Wafford joined Sun River in or about June of 2010. Pennington came on board in January 2011. On June 4, 2012, the Insiders caused Sun River to issue them promissory notes with a combined principal amount of about $5.5 million to secure purportedly past-due compensation. Even if Sun River had never paid the Insiders a penny on their employment contracts—which is far from the case— and even if, contrary to the terms of the contracts, payments were due on Day 1, the company would have owed the Insiders millions less than the note amounts.

The notes were secured with first-position security interests in the Colfax County Property. Schmidt signed the mortgage on behalf of Sun River, granting the security interest to Wafford, Pennington, and Schmidt's company Sierra Foxtrot, LP. Sun River issued these notes while it was both insolvent and a defendant in a shareholder derivative suit. Indeed, the notes were issued three days before a scheduled hearing on the derivative plaintiffs' motion to appoint a receiver for Sun River and to enjoin Sun River from encumbering its assets. The Insiders,

therefore, caused Sun River to grant them a security interest on account of antecedent debt based on an employment agreement and in exchange for no new value at a time the company was insolvent, and all in an effort to obtain a security interest in preference to known creditors and as part of a scheme to bankrupt the company in order to foreclose on its main asset. Fraudulent conveyances don't get more textbook than this one.

The Insiders, particularly Schmidt, had no issue with bankrupting Sun River. In fact, Schmidt stated that his "fall back solution" was to put Sun River into bankruptcy to collect on his mortgage note. (Exhibit A, ¶ 4). He pursued this course in earnest after a trade creditor commenced an insolvency proceeding against Sun River in Montgomery County, Texas, resulting in the appointment of a receiver. The receiver endeavored to sell the Colfax County Property, subject to all existing liens, for an amount sufficient to pay the trade creditors' claim and his fees. As part of that process, Schmidt engaged Lockhart Oil & Gas, LLC ("Lockhart") in conversations about purchasing the Colfax County Property from the receiver, subject to existing liens, and then immediately repaying the amounts that the Insiders claimed they were owed. Lockhart agreed. In light of this agreement, the Insiders did not oppose the sale to Lockhart.

In other words, solely to protect their *personal* interests as Sun River creditors, the Insiders cooperated in a purported sale of Sun River's principal asset for far less than its value. Lockhart purchased the Colfax County Property in a further fraudulent conveyance, but has not paid the Insiders out of legitimate concerns about the validity of their liens.

Since the beginning of this bankruptcy, the Insiders have initiated frivolous litigation in an unveiled attempt to thwart the Trustee's efforts to recover the Colfax County Property for the Estate. Most recently, the Insiders appealed the Court's Order Clarifying Scope of Automatic Stay [Dkt. 70] to the U.S. District Court for the District of Colorado. The Insiders' litigation

positions, while aggressive, are wholly baseless and unworthy of the generous settlement that the Trustee has offered.

If approved, this Settlement will reward the Insiders, who are responsible for driving Sun River into bankruptcy, to the detriment of other creditors of the Estate. The most troubling part of the Settlement is that the Trustee proposes to give a first priority secured claim of approximately $3,000,000 to the Insiders. The Trustee intends to file an adversary proceeding seeking to avoid the transfer of the Colfax County Property. However, if he is unsuccessful, the Trustee gives the Insiders his blessing to continue to prosecute the foreclosure action currently pending in New Mexico.

## Argument

To approve the Settlement, this Court must find that the settlement is "fair and equitable and in the best interests of the estate." *In re Bugaighis*, 2004 WL 3190352, at *5 (Bankr. D. Colo. Nov. 5, 2004). In making this determination, this Court considers the following factors: "1) the probable success of the litigation on the merits; 2) any potential difficulty in collection of a judgment; 3) the complexity and expense of the litigation; and 4) the interests of creditors in deference to their reasonable views." *Id.* (citing *Kaiser v. Steel Corp. v. Frates*, 105 B.R. 971, 976-77 (D. Colo. 1989)).

The Settlement at issue is neither fair nor equitable and is not in best interests of the Estate. Therefore, the Trustee's motion should be denied.

**I.  The Insiders' Transaction Is a Fraudulent Conveyance.**

The Settlement agrees to pay the Insiders approximately $3,000,000, when their claim should be disallowed in its entirety as a fraudulent conveyance. The Trustee contends that he may not succeed if he challenges the validity of the notes and the mortgage. Nova believes

6

otherwise. The Insiders' claim is easily avoidable as a fraudulent transfer under Section 544 of the Bankruptcy Code and the Colorado Uniform Fraudulent Transfer Act ("CUFTA"). Under CUFTA, a transfer is fraudulent if the debtor made the transfer:

> (a) With actual intent to hinder, delay, or defraud any creditor of the debtor; or
> (b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor;
> (I) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> (II) Intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

C.R.S. § 38-8-105. There is ample evidence that the Insiders' Transaction was made for the sole purpose of defrauding other creditors of Sun River. The circumstances surrounding the transaction alone give rise to a presumption of fraud. For instance, the Insiders' Transaction was executed on June 4, 2012, a mere three days prior to the injunction hearing in the derivative suit.

Moreover, the Insiders grossly overstated their compensation with respect to this transaction. Under their employment contracts, Schmidt and Wafford received a salary of $25,000 per month, totaling $300,000 per year. Pennington received a salary of $20,833 per month, totaling of $249,996 per year. None of the Insiders was to receive cash payments for the first year of employment, receiving instead stock options as compensation. The Insiders entered into a settlement with Sun River approximately two years after commencing employment, alleging that each was owed one year's worth of salary. Taking the Insiders at their word, at most Sun River owed them compensation totaling $849,996. Yet, the Insiders executed a promissory note and mortgage in the combined principal amount of approximately $5.5 million, an overstatement of $4.6 million.

Not only did the Insiders grossly overstate their compensation, but they also failed to disclose this transaction during the injunction hearing held on June 7, 2012, involving the shareholders' request to enjoin the alienation or encumbering of Sun River's assets. (*See* Exhibit E, Amended Petition, p. 21) The Insiders' Transaction left Sun River with insufficient assets to pay its other creditors. In fact, Schmidt has confirmed that he fully intended to bankrupt Sun River to collect on his note, and in the process, defraud other creditors. (Exhibit A, ¶ 4)

The Trustee believes that the Rooker-Feldman doctrine may bar any challenge to the notes and mortgage because of a settlement agreement approved by the Texas court. Nova disagrees. The Rooker-Feldman doctrine precludes lower federal courts from exercising jurisdiction over state court judgments. *In re Flanders*, 517 B.R. 245, 255 (Bankr. D. Colo. 2014), *aff'd*, 2015 WL 4641697 (10th Cir. BAP Aug. 5, 2015). However, the Rooker-Feldman doctrine does not apply if the purpose of a federal action is "separable from and collateral to" the state court judgment. *Kiowa Indian Tribe v. Hoover*, 150 F.3d 1163, 1169–70 (10th Cir.1998). This Court has expressly recognized the limitations of the doctrine and its narrow application. *In re Flanders*, 517 B.R. at 255. The Texas court's order approving the settlement did not make substantive findings addressing the specific issue presented here, *i.e.*, whether the Insiders' Transaction was made with the intent to defraud Sun River's creditors. Therefore, the Rooker-Feldman doctrine is not applicable.

Such litigation would not be complex or expensive. The issue of whether the Insiders' Transaction was a fraudulent conveyance is not a complex issue and is a fairly typical case for a bankruptcy court to handle. Additionally, an adversary proceeding in bankruptcy court is highly likely to go to trial much more quickly than a similar case in state court. The parties already

have much of the discovery that would be required for litigation.  Last, there is no issue with collection of a judgment, therefore this factor disfavors settlement.

Consequently, all four of the governing factors demonstrate that the Settlement is unfair, inequitable, and contrary to the interests of the Estate.

## II.     The Insiders' Claims Should Be Equitably Subordinated.

Alternatively, the Settlement is inappropriate because the Insiders' claims should be equitably subordinated.  Nova intends to file an adversary proceeding shortly hereafter on this basis.  The doctrine of equitable subordination is governed by Section 510(c) of the Bankruptcy Code, and provides:

> Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—
> (1) Under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim . . .

11 U.S.C. § 510(c).  To determine whether equitable subordination is appropriate, the Tenth Circuit has adopted the three-part test set forth in *In re Mobile Street*, 562 F.2d 692 (5th Cir. 1977).  Equitable subordination is appropriate where (1) "the claimant has engaged in inequitable conduct;" (2) "the conduct has injured creditors or given unfair advantage to the claimant;" and, (3) "subordination of the claim is not inconsistent with the Bankruptcy Code."  *Sloan v. Zions First Nat'l Bank (In re Castletons, Inc.),* 990 F.2d 551, 559 (10th Cir. 1993).  Inequitable conduct, in turn, encompasses three categories of misconduct:  "(1) fraud, illegality, and breach of fiduciary duties; (2) undercapitalization; or (3) claimant's use of the debtor as a mere instrumentality or alter ego." *In re Hedged-Investments Associates, Inc.*, 380 F.3d 1292, 1301 (10th Cir. 2004) (citation omitted).  Where the claimant is an insider, as the claimants are here, a

9

party seeking subordination only needs to show "some unfair conduct, and a degree of culpability, on the part of the insider." *Id.*

The Insiders' misconduct requires the equitable subordination of their claims to those of the other secured creditors. In addition to the fraudulent conveyances as set forth above, Schmidt has personally engaged in, including but not limited to, the following misconduct:

1. Wasting corporate assets through, among other things, frivolous litigation against personal adversaries and confessing frivolous litigation claims brought by personal friends;
2. Misappropriation of Sun River's interests in the Neal Heirs well;
3. Misappropriation of $500,000 owed to Sun River for personal use of private aircraft;
4. Forgery of the documents assigning the well bore hole and equipment to Texokan- a company in which he has an interest;
5. Displaying a firearm to intimidate and manipulate Sun River's Board members into approving self-dealing transactions;
6. Grossly overstating his compensation with respect to the Insiders' Transaction; and
7. Taking steps to render Sun River insolvent in order to collect on his mortgage note.

Equity demands, at the very least, subordination of the Insiders' claims. It offends equity to permit the Insiders to recover before all other creditors.

### III. The Trustee is Exceedingly Likely to Prevail in the Settled Contested Matters.

In addition to the Insiders' purported secured claim, the Settlement seeks to settle the following contested matters: (1) Pennington's Motion to Transfer Venue ("Venue Motion") [Dkt. 21] and (2) Sierra Foxtrot's appeal of this Court's Order Clarifying Scope of Automatic Stay (the "Appeal") [Dkt. 77]. The Trustee is exceedingly likely to succeed on both of these

matters and at little expense. The settlement confers scant benefit in terms of risk mitigation or expense saving.

The Trustee himself admits that he is very likely to prevail on the Venue Motion and the Appeal. First and foremost, venue is proper is Colorado because Sun River has its place of incorporation here. Moreover, the Estate would incur substantial expense if the venue were changed to Texas, as stated by the Trustee, because the Trustee is located in Colorado and has relocated all of Sun River's records to Colorado. Likewise, the Trustee is very likely to prevail on the Appeal given that Schmidt has not even sought relief from the automatic stay and that the Trustee intends to file an adversary proceeding to avoid the transfer of the Colfax County Property and recover it for the Estate. As such, these factors weigh in favor of denying the Trustee's motion.

### IV. The Settlement is Not in the Best Interest of Creditors.

The Settlement harms all creditors other than the Insiders. It allows and prioritizes a fraudulent claim. It gives the Insiders an incentive to market and sell the Colfax County Property at a price sufficient to pay off their first priority claim only. Unless their claims are equitably subordinated, it is unlikely that the Insiders will be useful in commanding a sufficient price for the Colfax County Property to pay other creditors of the Estate. Therefore, this Settlement is unacceptable and should not be approved by this Court.

### Conclusion

WHEREFORE, Nova respectfully requests that the Court deny the Trustee's Motion to Approve the Settlement Agreement and for such other relief that this Court deems just and proper.

DATED this 25th day of November, 2015.

            Respectfully submitted,

            *s/ Nicole Detweiler*
            Jordan Factor
            Nicole Detweiler
            ALLEN & VELLONE, P.C.
            1600 Stout Street, Suite 1100
            Denver, CO 80202
            Telephone: (303) 534-4499
            jfactor@allen-vellone.com
            ndetweiler@allen-vellone.com
            ATTORNEY FOR NOVA LEASING, LLC

            Tobin D. Kern
            Volant Law LLC
            333 W. Hampden Ave., Suite 1000
            Englewood, CO 80110
            CO-COUNSEL FOR NOVA LEASING, LLC

**CERTIFICATE OF SERVICE**

    I hereby certify that on the 25th day of November, 2015, I electronically filed the foregoing **NOVA LEASING'S OBJECTION TO TRUSTEE'S MOTION TO APPROVE SETTLEMENT AGREEMENT BETWEEN TRUSTEE, DONAL R. SCHMIDT, SIERRA FOXTROT, L.P., AND JAMES E. PENNINGTON** with the Clerk of Court and a copy will be served by U.S. Mail, first class postage prepaid, to the following:

| | |
|---|---|
| David Wadsworth<br>1660 Lincoln St.<br>Ste. 2200<br>Denver, CO 80264 | M. Gabriel McFarland, LLC<br>Cyd Hunt<br>Evans & McFarland, LLC<br>Golden, CO 80401 |
| James E. Pennington<br>LAW OFFICES OF JAMES E.<br>PENNINGTON, P.C.<br>900 Jackson Street, Suite 440<br>Dallas, Texas 75202 | Christian C. Onsager<br>Onsager Guyerson Fletcher Johnson, LLC<br>1801 Broadway, Suite 900<br>Denver, CO 80202 |
| Donal R. Schmidt, Jr.<br>The Law Firm of Donal R. Schmidt, Jr..<br>5646 Milton St., Suite 130<br>Dallas, Texas 75206 | Torben Welch<br>1430 Wynkoop St., Ste. 400<br>Denver, CO 80202 |
| Tobin D. Kern<br>Volant Law LLC<br>333 W. Hampden Ave., Suite 1000<br>Englewood, CO 80110 | Dave Giddens<br>10400 Academy NE, Suite 350<br>Albuquerque, NM 87111 |

                *s/ Terri Novoa*