**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 15-15610 MER |
| SUN RIVER ENERGY, INC., | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| HARVEY SENDER, | ) | |
| Chapter 7 Trustee, | ) | Adversary Proceeding No. |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| LOCKHART OIL & GAS, LLC | ) | |
| | ) | |
| Defendant. | ) | |

**COMPLAINT**

HARVEY SENDER, Trustee, by and through his counsel, Sender Wasserman Wadsworth, P.C., for his Complaint against Lockhart Oil & Gas, LLC, states and alleges as follows:

**JURISDICTION AND VENUE**

1. The Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b) and (e).

2. This proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(E), (H), and (O).

3. Venue in this district is proper under 28 U.S.C. § 1409(a).

4. This adversary proceeding is commenced pursuant to Rule 7001(1) of the Federal Rules of Bankruptcy Procedure.

# GENERAL ALLEGATIONS

### Parties and Procedural Background

5. Plaintiff Harvey Sender (the "Trustee") is the duly appointed chapter 7 trustee of the bankruptcy estate of Sun River Energy, Inc. ("Sun River"), Case No. 15-15610 MER.

6. Defendant Lockhart Oil & Gas, LLC ("Lockhart") is a Texas limited liability company.

7. On May 21, 2015, three creditors of Sun River commenced an involuntary bankruptcy against Sun River in the United States Bankruptcy Court for the District of Colorado (the "Bankruptcy Court").

8. The involuntary petition was not contested. On June 17, 2015, the Bankruptcy Court entered the Order for Relief in the case.

### The Colfax County Property

9. On March 23, 2006, Robert A. Doak, Jr. conveyed approximately 220,000 acres of oil, gas and other mineral interests located in Colfax County, New Mexico (the "CC Mineral Interests" or "Mineral Interests") to Sun River.

10. The real property the CC Mineral Interests are appurtenant to is owned primarily by Vermejo Park, LLC, an entity believed to be owned and controlled by the cable television magnate Ted Turner.

11. Two correction deeds were subsequently recorded, on May 5, 2009 and January 10, 2010, clarifying the description of the CC Mineral Interests.

12. Prior to June 2012, Sun River owned the CC Mineral Interests free and clear of liens.

13. The CC Mineral Interests may be worth upwards of $75-100 million.

### The Receivership and Sale to Lockhart

14. On February 6, 2013, CPR Operations, Inc. ("CPR"), a purported creditor of Sun River, commenced a civil action for damages against Sun River in Montgomery County, Texas District Court (the "Receivership Court"), Case No. DC-13-11-12339 CV (the "Receivership Case").

15. On May 23, 2013, CPR filed a motion for default judgment against Sun River in the Receivership Case based upon Sun River's failure to file an answer to CPR's petition.

16. Default judgment was entered on November 18, 2013 in the amount of approximately $262,000.

17. On September 19, 2014, CPR sought, and the Receivership Court approved, appointment of a receiver (the "Receiver") over Sun River's assets.

18. On December 18, 2014, the Receivership Court entered an Order Modifying Receivership. In the Order Modifying Receivership, the Receivership Court modified the Receiver's authority to provide that he was appointed pursuant *only* to Section 31.002 of the Texas Civil Practice and Remedies Code.

19. The Order also authorized the Receiver to "retain the power and be authorized to take possession of [sic] sell any and all *real property* assets owned by Defendant Sun River Energy, Inc., including *the real property in Colfax County, New Mexico* more particularly described on Exhibit A to the Motion to Modify, to obtain an offer to purchase property, accept the offer to purchase property, and conclude a sale of that real property, and to distribute the sales proceeds." (Emphasis added).

20. The Exhibit A referenced in the Order Modifying Receivership described the CC Mineral Interests.

21. Sun River did not own any "real property assets" in Colfax County, New Mexico. The only property it owned was the CC Mineral Interests.

22. The Receivership Court also lacked jurisdiction over assets located outside of Texas.

23. Nevertheless, on January 23, 2015, the Receiver filed a motion in the Receivership Case seeking approval of a sale of the CC Mineral Interests to Lockhart subject to existing liens. The motion was not verified or supported by affidavit.

24. The Receiver incorrectly stated in the motion that (a) he was authorized by the Receivership Court "to hire a broker to sell property and mineral interests" owned by Sun River and (b) Sun River "owns certain mineral and real property interests located in Colfax County, New Mexico."

25. No opportunity for objection to the motion was afforded by the Receiver or the Receivership Court.

26. The motion was not adequately served on all lienholders and was not served on any unsecured creditors of Sun River.

27. The cash component of purchase price for the CC Mineral Interests totaled $262,000.

28. The cash component of the purchase price was sufficient to pay the judgment owed CPR and the Receiver's expenses.

29. Lockhart knew prior to agreeing to purchase the CC Mineral Interests that said Property was subject to several valid and enforceable liens.

30. The Purchase and Sale Agreement ("the PSA") between the Receiver and Lockhart also includes the following term material to the within proceeding: The PSA provides that the Receiver's obligation to consummate the closing is subject to a "final and non-appealable Order Approving Sale from the District Court of Montgomery County, Texas in the case where Receiver has been appointed."

31. In connection with the PSA, the Receiver and Lockhart also negotiated an escrow agreement (the "Escrow Agreement"), whereby certain documents and monies would be held by an escrow agent pending closing of the sale.

32. The Escrow Agreement authorizes the Escrow Agent to comply only with "final orders."

33. On January 28, 2015, the Receivership Court entered an order approving the PSA and the Receiver's sale of the CC Mineral Interests to Lockhart.

34. The order was entered prior to certain entities listed on the motion's certificate of service, such as Nova Leasing, LLC ("Nova") (one of the petitioning creditors in the underlying bankruptcy case), even receiving a copy of the motion.

35. No evidentiary hearing was conducted in connection with the motion and no evidence was considered by the Receivership Court prior to its granting the motion.

36. On February 23, 2015, Nova filed a motion to reconsider the Receivership Court's order approving the sale of the CC Mineral Interests to Lockhart.

37. Nova asserted in its motion that notice of the motion was inadequate and that the sale order "includes a factual finding that the sale price of $262,000 for the Colfax County property is a 'fair price under the circumstances.' However, the Motion provides no information whatsoever concerning the value of the property or its fair price other than a description of existing liens on the property."

38. On May 7, 2015, without taking any evidence, the Receivership Court overruled Nova's motion to reconsider.

39. Nova timely filed a notice of appeal on May 18, 2015.

40. Prior to entering into the agreement with the Receiver to purchase the CC Mineral Interests, Lockhart acknowledged to Don Schmidt, the former President/CEO of Sun River and the holder, through Sierra Foxtrot, LP ("Sierra Foxtrot"), of a 47.5% interest in the first mortgage (the "PSW Mortgage") against the Mineral Interests, that Lockhart was purchasing the Property subject to various liens and that Lockhart would have to satisfy those liens in order to own the Mineral Interests free and clear of such liens.

41. Lockhart assured Mr. Schmidt on several occasions that Lockhart fully intended to pay the PSW Mortgage against the CC Mineral Interests upon closing of the purchase of the Property.

42. In reliance upon those representations, Mr. Schmidt and the other holders of the PSW Mortgage, James Pennington and Tim Wafford, did not oppose the Receiver's sale motion or seek reconsideration of the order approving the sale.

43. On March 9, 2015, Lockhart entered into an agreement to purchase Sierra Foxtrot's interest in the PSW Mortgage.

44. Lockhart entered similar agreements with Pennington and Wafford to purchase their interests (the remaining 52.5%) in the PSW Mortgage.

45. Lockhart made similar representations to James and Iva Ballard, who also hold a mortgage against the CC Mineral Interests (the "Ballard Mortgage"), and entered a similar agreement with the Ballards providing for the payment of the debt secured by the Ballard Mortgage at closing.

46. On April 21, 2015, Tim Wafford, the purported Chief Operating Officer of Sun River, executed a "Mineral Deed" conveying all of Sun River's right, title and interest in the CC Mineral Interests to Lockhart.

47. The Mineral Deed was recorded with the Colfax County, New Mexico Clerk on May 14, 2015.

48. Lockhart breached its agreement to pay the PSW Mortgage and Ballard Mortgage at closing.

<u>The Foreclosure Proceeding</u>

49. On February 26, 2015, James Pennington commenced an action in the Eighth Judicial District Court, Colfax County, New Mexico to foreclose the PSW Mortgage (the "Foreclosure Proceeding").

50. On March 12, 2015, a notice of lis pendens regarding the CC Mineral Interests was recorded with the Colfax County, New Mexico clerk.

51. Lockhart was served with notice of the Foreclosure Proceeding prior to closing on the purchase of the CC Mineral Interests.

52. Lockhart entered its appearance in the Foreclosure Proceeding on April 13, 2015.

53. In paragraph 19 of Lockhart's First Amended Answer filed in the Foreclosure Proceeding, Lockhart made the following admission: "Lockhart believes the prospect of payment is enhanced by the Sun River sale to Lockhart *which closed on May 28, 2015*, in accordance with which the Promissory Notes will be paid." (Emphasis added).

## Lockhart

54. In 2013, prior to the Receivership Case, Lockhart began talks to negotiate a purchase of the CC Mineral Interests from Sun River.

55. In May 2013, Lockhart prepared a Purchase and Sale Agreement providing for the purchase of the CC Mineral Interests for a price of not less than $20,000,000.

56. Shortly after, on July 31, 2013, Sprout Holdings, LLC ("Sprout") entered a "Mutual Confidentiality Agreement" (the "Sprout NDA") regarding Sprout's interest in potentially acquiring some or all of Sun River.

57. The counterparties to the agreement were Steve Henson (a former Sun River board member), Harry McMillan (a debtor of Sun River pursuant to a $669,000 judgment), Cicerone Corporate Development, LLC (a debtor of Sun River pursuant to a $1 million judgment), and Colin Richardson. All of these parties represented that they were Sun River shareholders.

58. The term of the Sprout NDA was 18 months.

59. Sprout and Lockhart are both owned and controlled by Matt Hainline and are alter egos of each other or of Mr. Hainline.

60. On July 17, 2014, during the term of the Sprout NDA, Lockhart and Sun River entered a Confidentiality and No Trade Agreement (the "Lockhart NDA") whereby Sun River agreed to provide certain proprietary and confidential information (the "PCI") to Lockhart in connection with Lockhart's analysis of the Colfax County Property in exchange for, among other consideration, Lockhart's agreements (a) to use the PCI solely for the purpose of evaluating the Colfax County Property "and not to use the PCI for [Lockhart's] financial advantage without compensation to [Sun River]" and (b) "[n]ot to purchase or acquire in any manner, directly or

6

indirectly, any oil or gas ownership, leasehold, royalty or other interest within the [CC Mineral Interests]" unless agreed to by Sun River.

61. The term of the Lockhart NDA was one year.

62. The Lockhart NDA is binding on Lockhart's successors and assigns. The NDA is not binding on Sun River's successors and assigns.

63. In the second half of 2014, while still subject to the Lockhart NDA and prior to entering the PSA with the Receiver, Lockhart conducted land work on the CC Mineral Interests as part of its due diligence.

64. In September 2014, while still subject to the Lockhart NDA and prior to entering the PSA with the Receiver, Lockhart hired (a) DeGolyer and MacNaughton to conduct an independent report on the conventional and unconventional prospective resources of the CC Mineral Interests and (b) P2 Energy Solutions to produce maps of the acreage to facilitate the work of Lockhart's landman team.

65. As early as February 2015, Lockhart began marketing the CC Mineral Interests to potential investors and buyers.

66. On April 17, 2015, Lockhart represented to at least one potential target that the lease rights for the CC Mineral Interests were "conservatively" valued at between $45-100 million.

67. In June 2015, Lockhart expanded on its valuation analysis in its marketing materials as follows:

> Lockhart Oil and Gas has perfected its ownership of 100% net mineral interest in ~193,000 acres of oil and gas in Colfax County, New Mexico out of the Maxwell Land grant (see attached history). Over the last 18 months Lockhart has completed land work, title work and mapping on the 193,000 acres and prepared it for lease. We feel with some additional investment, in time, we should be able to perfect the title on more acreage; Potentially 50,000 or more acres of additional mineral interest.
>
> We have completed the resource evaluation with a well-known consulting firm and geology group to evaluate the resource potential. 15 formations were identified which have a history of producing hydrocarbons. The evaluation showed a high estimate potential of over 8 trillion cubic feet of natural gas. Oil shows in multiple formations were present in wells that were drilled on the property.

7

> Before Lockhart Oil and Gas acquired the Maxwell Land Grant, it was held as the primary asset of Sun River Energy, a public company. On February 10, 2011 there were 25,802,005 issued and outstanding shares of Sun River Energy common stock (SNRV). On that date the price was $46.00, a value of $1,186,892,230. (Form SC13D/A, Amended statement of beneficial ownership, June 2, 2011)
>
> Due to the mismanagement and legal issues of Sun River, Lockhart was able to purchase this property through court appointed receivership and was awarded ownership through a court order on January 28, 2015 with the assumption of all remaining debt; approximately $11 million.
>
> Before the price of oil dropped to $43, we were seeking a minimum leasing bonus of $100 million and planned on retaining a royalty interest of 20 percent. However, since the market has changed, we feel that the leasing bonus should be $10-20 million with royalty interest valued at an additional $30-60 million is achievable now. If the market improves, the sky is the limit.

68. In an Excel document generated in July 2015, Lockhart described various scenarios regarding a sale of the CC Mineral Interests. The sale price in the scenarios ranged from $20,000,000 to $40,000,000.

### FIRST CLAIM FOR RELIEF
**(Fraud in the Inducement)**

69. The Trustee incorporates by this reference the allegations contained in Paragraphs 1 through 68 above as though more fully set forth in this Claim for Relief.

70. In early 2013, Lockhart commenced a fraudulent scheme to obtain the CC Mineral Interests from Sun River at a fraction of their fair market value.

71. Lockhart initially reached out to and negotiated with persons holding themselves out as management of Sun River, such as Schmidt and Wafford.

72. Lockhart initially prepared a purchase agreement valuing the CC Mineral Interest at $20,000,000.

73. Unsatisfied with this price, within months, Lockhart, acting through Sprout, entered the Sprout NDA with various purported shareholders of Sun River.

74. By negotiating with these purported shareholders, who were at that time involved in a pitched battle with purported management in a derivative shareholder lawsuit, Lockhart

believed it could acquire the mineral assets at a substantially reduced price through the purchase of controlling interest in the stock of Sun River.

75. When this end run around Sun River's purported management failed, Lockhart resumed negotiations in 2014 with the same purported managers it had negotiated with in 2013.

76. While the Sprout NDA was still in effect, and in flagrant violation of that agreement, Lockhart negotiated the Lockhart NDA with purported management, thereby abandoning the purported shareholders and aligning itself with management.

77. Sun River believed Lockhart was acting in good faith during the negotiations regarding the Lockhart NDA and had no knowledge of the existence of the Sprout NDA.

78. Lockhart concealed the existence of the Sprout NDA from Sun River during these negotiations.

79. Lockhart also affirmatively misrepresented on multiple occasions that it had had no contact or dealings with McMillan or Henson, two of the parties to the Sprout NDA.

80. Soon after executing the Lockhart NDA, Lockhart switched gears again and, in violation of both the Sprout NDA and the Lockhart NDA, began negotiating a purchase of the CC Mineral Interests from the Receiver.

81. Upon information and belief, Lockhart concealed the existence of both the Sprout NDA and the Lockhart NDA from the Receiver.

82. The Receiver did not succeed to Sun River's rights under the Lockhart NDA. The Lockhart NDA does not fall with the category of "assets" the Receiver was given control over in the initial Receiver appointment order.

83. In any event, under the Order Modifying Receivership, the Receiver's powers were limited to those conferred under Section 31.002 of the Texas Civil Practice and Remedies Code.

84. Section 31.002 only authorizes a receiver to "reach property to obtain satisfaction on the judgment, if the judgment debtor owns property . . . that (1) cannot readily be attached or levied on by ordinary legal process" and is non-exempt. Section 31.002 does not grant a receiver the right to operate a judgment debtor's business or control over its contracts.

85. Accordingly, the PSA negotiated between Lockhart and the Receiver was entered into in flagrant violation and breach of the Lockhart NDA.

86. The fraudulent scheme did not end with the negotiation of the PSA, which provided that Lockhart would take the CC Mineral Interests subject to existing liens, in the

approximate amount of $9.3 million, together with a cash payment of $262,000. Rather, the scheme continued throughout 2015.

87. Unsatisfied with obtaining an asset Lockhart "conservatively" valued in 2015 marketing materials at $100 million at less than 10% of that valuation, Lockhart immediately began negotiating a discounted payoff of the PSW Mortgage and the Ballard Mortgage in an effort to induce the holders of those mortgages to support the PSA.

88. The PSW Mortgage and Ballard Mortgage balances were listed in the documents attached to the PSA at approximately $8.4 million and therefore represented approximately 90% of the debt secured by the CC Mineral Interests.

89. Lockhart represented to the holders of the PSW Mortgage—Pennington, Schmidt and Wafford—and the Ballards that it would pay their mortgages at closing of the PSA.

90. Pennington, Schmidt, Wafford, and the Ballards relied upon these representations and, as a result, lodged no objection to the PSA because they believed the debts owed them would be paid.

91. Lockhart then induced Pennington, Schmidt, Wafford and the Ballards to execute documents releasing their interests in the PSW Mortgage, which documents were escrowed pending closing and receipt of payment.

92. Lockhart never intended to pay the PSW Mortgage or the Ballard Mortgage.

93. Lockhart breached its agreements with Pennington, Schmidt, Wafford, and the Ballards and, as of the date of the filing of the within Complaint, has not paid any of these individuals as required under the various agreements.

94. Worse yet, Lockhart took the position in the Foreclosure Proceeding that the PSW Mortgage is invalid.

95. Thus, having induced Pennington, Schmidt and Wafford to go along with the PSA based upon the false promise of payment, and having signed documents acknowledging the validity of the PSW Mortgage, Lockhart first breached the various agreements by non-payment and then, in complete denial of his signed agreements, has argued that the PSW Mortgage is invalid.

96. The scheme thus achieved its ultimate aim: Lockhart, through a pattern of concealment, bad faith negotiating tactics, fraudulent misrepresentations, and abject disregard of multiple signed and binding contracts, has obtained title to the CC Mineral Interests for a fraction of their value. If Lockhart succeeded in invalidating the PSW Mortgage, the total potential cost to Lockhart would be less than $2 million, assuming it actually paid the remaining encumbrances (and that assumption is contrary to Lockhart's entire course of dealing since 2013).

97. Lockhart's fraudulent scheme has caused obvious and significant damages to Sun River.

98. Lockhart defrauded not only Sun River, the purported shareholder parties to the Sprout NDA, Pennington, Schmidt, Wafford and the Ballards, but also the Receiver by its failure to disclose the Lockhart NDA while negotiating the PSA.

99. As a result of his scheme, Sun River lost title to the CC Mineral Interests, its sole asset of significant value.

100. The appropriate remedy for Lockhart's fraud is rescission of the PSA and voiding of the Mineral Deed.

WHEREFORE, the Trustee respectfully requests that the Court enter judgment in his favor and against Lockhart rescinding the PSA, voiding the Mineral Deed, and granting such other relief as the Court deems appropriate.

## SECOND CLAIM FOR RELIEF
### (Avoidable transfer under 11 U.S.C. § 548(a)(1)(B))

101. The Trustee incorporates by this reference the allegations contained in Paragraphs 1 through 100 above as though more fully set forth in this Claim for Relief.

102. Under 11 U.S.C. § 548(a)(1)(B), the Trustee may avoid a transfer made on or within two years of the Petition Date, if the debtor "voluntarily or involuntarily—. . . (B) received less than a reasonably equivalent value in exchange for such transfer. . ." and

(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or
(IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

103. In May, 2015, Sun River, acting under the control of the Receiver, transferred the CC Mineral Interests to Lockhart (the "Transfer").

104. In the event the Transfer is deemed to have occurred on May 14, 2015, the date the Mineral Deed was recorded, the Transfer is a pre-petition transfer.

105. The Transfer was made on or within two years prior to the Petition Date.

106. Sun River received less than a reasonably equivalent value in exchange for the Transfer.

107. As set forth above, Lockhart paid $262,000 in cash for an asset he "conservatively" valued at the time of the Transfer at $100,000,000. While Lockhart agreed to take the property subject to existing liens, he has failed to pay any debts secured by such liens and instead has argued that approximately 80% of the secured debt (represented by the PSW Mortgage) is invalid.

108. On the date the Transfer was made, Sun River was not operating. Sun River was therefore either:

   a. insolvent or became insolvent as a result of the Transfer;

   b. engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Sun River was an unreasonably small capital; or,

   c. intended to incur, or believed that Sun River would incur, debts that would be beyond Sun River's ability to pay as such debts matured.

109. As a result of the foregoing, the Transfer is avoidable by the Trustee pursuant to 11 U.S.C. § 548(a)(1)(B).

WHEREFORE, the Trustee respectfully requests that the Court enter judgment in his favor and against Lockhart, (a) avoiding the Transfer pursuant to 11 U.S.C. § 548(a)(1)(B); (b) authorizing, pursuant to 11 U.S.C. § 550(a), the recovery of the avoided Transfer or the value thereof from Lockhart; and (c) granting such other relief as the Court deems appropriate.

### THIRD CLAIM FOR RELIEF
**(Avoidable transfer under 11 U.S.C. § 544(a))**

110. The Trustee incorporates by this reference the allegations contained in Paragraphs 1 through 109 above as though more fully set forth in this Claim for Relief.

111. Under 11 U.S.C. § 544(a), the Trustee has the rights and powers of, or may avoid any transfer of property of the debtor that is voidable by any of the following hypothetical interest holders: (a) judicial lien creditor; (b) an execution lien creditor; or (c) a bona fide

purchaser of real property from the debtor against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case.

112. The rights of the hypothetical interest holders described in § 544(a) are determined by reference to state law.

113. Because the CC Mineral Interests are located in New Mexico, New Mexico law controls the determination of the rights of the hypothetical interest holders described in § 544(a).

114. The Transfer is avoidable by one or more of the hypothetical interest holders described in § 544(a) for any of the following reasons:

      a. The Receivership Court lacked jurisdiction over the CC Mineral Interests. The CC Mineral Interests are located in New Mexico and the Receivership Court's jurisdiction is limited to assets located with Texas.

      b. The sale of the CC Mineral Interests was outside the scope of the Receiver's authority. The Receiver's authority was expanded to include the authority to sell real property owned by Sun River in New Mexico, but the CC Mineral Interests are not real property interests. The Order Modifying Receivership does not extend to cover the sale of foreign mineral interests.

      c. The sale of the CC Mineral Interests violated Section 31.002 of the Texas Civil Practice and Remedies Code. That section authorizes receiver sales only if the subject property "cannot readily be attached or levied on by ordinary legal process." No showing was made by the Receiver (or more appropriately, the petitioning creditor, CPR) that the CC Mineral Interests could not be readily attached or levied on by ordinary legal process. No finding on this threshold requirement was made by the Receivership Court. Indeed, no such finding could be made as levying on property interests is absolutely permissible under Texas and New Mexico law. CPR could have domesticated its judgment in New Mexico, obtained a judicial lien, and foreclosed on its interest, all of which constitute "ordinary collection practice." By its plain terms, Section 31.002 may not be used as a substitute for such ordinary collection practice.

      d. The sale of the CC Mineral Interests was inadequately noticed. Notice of the Receiver's proposed sale was made to only some, but not all of the holders of liens against the Mineral Interests including, for example, the Internal Revenue Service (only the IRS's phone number is listed on the certificate of service). In addition, despite mailing the sale motion to other lien holders, no opportunity to object was provided, and the Receivership Court entered the order approving the sale before, in at least one instance, the lienholder (Nova) received a copy of the motion.

      e. The order approving the sale of the CC Mineral Interests is not based on an adequate factual record. The sale order "includes a factual finding that the sale price of

$262,000 for the Colfax County property is a 'fair price under the circumstances.'" However, no information was provided by the Receiver concerning the value of the property, or whether any marketing was undertaken prior to agreeing to the PSA.

   f. The Transfer was made in violation of the PSA which provided that closing of the sale could not occur until entry of a "final and non-appealable Order Approving Sale from the District Court of Montgomery County, Texas in the case where Receiver has been appointed." The Receiver acknowledged this requirement in a letter sent to Lockhart on April 22, 2015, in which he stated the following:

> In my capacity as Receiver, I have an obligation to abide by the terms of the contract and the Court's order approving same. Although my opinion is that Nova has not provided competent evidence that would warrant any modification of the order, I am not prepared to close prior to May 13, 2015, unless [Lockhart] agrees to waive the contractual requirement of a final an non-appealable order and indemnify, defend and hold me harmless from and against any potential causes of action, claims, losses, costs and expenses resulting from or associate with the transaction closing prior to the date on which the trial court's plenary power expires.

Upon information and belief, no such waiver or indemnification was provided by Lockhart prior to the closing.

   g. The Transfer was made in violation of the Escrow Agreement which provided that closing of the sale could not occur until the Receivership Court's orders were final.

   h. As acknowledged by the Receiver, and in addition to the closing violating the PSA, the Transfer is not enforceable against the hypothetical interest holders described above because it was made "prior to the date on which the trial court's plenary power expire[d]."

   i. The Mineral Deed was not executed by a person with authorization to bind Sun River. Tim Wafford, the person who executed the Mineral Deed, held himself out as the Chief Operating Officer of Sun River, but he had resigned from such position years prior to the Transfer. Further, as described above, Wafford had separately negotiated a deal with Lockhart providing for the transfer of his interest in the PSW Mortgage upon the closing of the sale. Given this actual conflict of interest, Wafford, as a purported officer of the company, was powerless to convey title to an asset of such value without the prior approval of Sun River's board of directors, which approval, upon information and belief, was neither sought nor obtained.

   j. The Transfer was made after the filing of the lis pendens in the Foreclosure Proceeding and was therefore void as against the hypothetical interest holders described above.

WHEREFORE, the Trustee respectfully requests that the Court enter judgment in his favor and against Lockhart, (a) avoiding the Transfer pursuant to 11 U.S.C. § 544(a); (b) authorizing, pursuant to 11 U.S.C. § 550(a), the recovery of the avoided Transfer or the value thereof from Lockhart; and (c) granting such other relief as the Court deems appropriate.

## **FOURTH CLAIM FOR RELIEF**
**(Declaratory Relief)**

115.   The Trustee incorporates by this reference the allegations contained in Paragraphs 1 through 114 above as though more fully set forth in this Claim for Relief.

116.   The Trustee seeks a declaration that the Transfer is void or voidable because the Receivership Court lacked jurisdiction over the CC Mineral Interests. The CC Mineral Interests are located in New Mexico and the Receivership Court's jurisdiction is limited to assets located with Texas.

117.   The Trustee seeks a declaration that the Transfer is void or voidable because the sale of the CC Mineral Interests was outside the scope of the Receiver's authority. The Receiver's authority was expanded to include the authority to sell real property owned by Sun River in New Mexico, but the CC Mineral Interests are not real property interests. The Order Modifying Receivership does not extend to cover the sale of foreign mineral interests.

118.   The Trustee seeks a declaration that the Transfer is void or voidable because the sale of the CC Mineral Interests made in violation of Section 31.002 of the Texas Civil Practice and Remedies Code. That section authorizes receiver sales only if the subject property "cannot readily be attached or levied on by ordinary legal process." No showing was made by the Receiver (or more appropriately, the petitioning creditor, CPR) that the CC Mineral Interests could not be readily attached or levied on by ordinary legal process. No finding on this threshold requirement was made by the Receivership Court. Indeed, no such finding could be made as levying on property interests is absolutely permissible under Texas and New Mexico law. CPR could have domesticated its judgment in New Mexico, obtained a judicial lien, and foreclosed on its interest, all of which constitute "ordinary collection practice." By its plain terms, Section 31.002 may not be used as a substitute for such ordinary collection practice.

119.   The Trustee seeks a declaration that the Transfer is void or voidable because the sale of the CC Mineral Interests was inadequately noticed. Notice of the Receiver's proposed sale was made to only some, but not all of the holders of liens against the Mineral Interests including, for example, the Internal Revenue Service (only the IRS's phone number is listed on the certificate of service). In addition, despite mailing the sale motion to other lien holders, no opportunity to object was provided, and the Receivership Court entered the order approving the sale before, in at least one instance, the lienholder (Nova) received a copy of the motion.

120. The Trustee seeks a declaration that the Transfer is void or voidable because the order approving the sale of the CC Mineral Interests is not based on an adequate factual record. The sale order "includes a factual finding that the sale price of $262,000 for the Colfax County property is a 'fair price under the circumstances.'" However, no information was provided by the Receiver concerning the value of the property, or whether any marketing was undertaken prior to agreeing to the PSA.

121. The Trustee seeks a declaration that the Transfer is void or voidable because the Transfer was made in violation of the PSA which provided that closing of the sale could not occur until entry of a "final and non-appealable Order Approving Sale from the District Court of Montgomery County, Texas in the case where Receiver has been appointed." The Receiver acknowledged this requirement in a letter sent to Lockhart on April 22, 2015, in which he stated the following:

> In my capacity as Receiver, I have an obligation to abide by the terms of the contract and the Court's order approving same. Although my opinion is that Nova has not provided competent evidence that would warrant any modification of the order, I am not prepared to close prior to May 13, 2015, unless [Lockhart] agrees to waive the contractual requirement of a final an non-appealable order and indemnify, defend and hold me harmless from and against any potential causes of action, claims, losses, costs and expenses resulting from or associate with the transaction closing prior to the date on which the trial court's plenary power expires.

Upon information and belief, no such waiver or indemnification was provided by Lockhart prior to the closing.

122. The Trustee seeks a declaration that the Transfer is void or voidable because the Transfer was made in violation of the Escrow Agreement which provided that closing of the sale could not occur until the Receivership Court's orders were final.

123. The Trustee seeks a declaration that the Transfer is void or voidable because, as acknowledged by the Receiver, and in addition to the closing violating the PSA, the Transfer was made "prior to the date on which the trial court's plenary power expire[d]."

124. The Trustee seeks a declaration that the Transfer is void or voidable because the Mineral Deed was not executed by a person with authorization to bind Sun River. Tim Wafford, the person who executed the Mineral Deed, held himself out as the Chief Operating Officer of Sun River, but he had resigned from such position years prior to the Transfer. Further, as described above, Wafford had separately negotiated a deal with Lockhart providing for the transfer of his interest in the PSW Mortgage upon the closing of the sale. Given this actual conflict of interest, Wafford, as a purported officer of the company, was powerless to convey title to an asset of such value without the prior approval of Sun River's board of directors, which approval, upon information and belief, was neither sought nor obtained.

125. The Trustee seeks a declaration that the Transfer is void or voidable because the Transfer was made after the filing of the lis pendens in the Foreclosure Proceeding.

126. The Trustee seeks a declaration that the Transfer is void or voidable because Lockhart made a judicial admission in paragraph 19 of its First Amended Answer filed in the Foreclosure Proceeding that the Transfer occurred on May 28, 2015, after the Petition Date.

127. The Trustee seeks a declaration that the Transfer is void or voidable because Lockhart made a judicial admission in paragraph 19 of its First Amended Answer filed in the Foreclosure Proceeding that the Transfer, to be effective, required payment of the PSW Mortgage and Ballard Mortgage at closing.

WHEREFORE, the Trustee respectfully requests that the Court enter judgment in his favor and against Lockhart declaring the Transfer void or voidable for any of the reasons set forth in this claim for relief and granting such other relief as the Court deems appropriate.

## FIFTH CLAIM FOR RELIEF
### (Avoidable Post-Petition Transfer Under 11 U.S.C. § 549 – Plead in the Alternative to the First, Second, Third, and Fourth Claims for Relief)

128. The Trustee incorporates by this reference the allegations contained in Paragraphs 1 through 127 above as though more fully set forth in this Claim for Relief.

129. Under 11 U.S.C. § 549(a), the Trustee may avoid a transfer of property of the estate that occurs after the commencement of the case and that is not authorized by the Court.

130. As set forth above, Lockhart admitted in paragraph 19 of its First Amended Answer filed in the Foreclosure Proceeding that the Transfer occurred on May 28, 2015, after the Petition Date.

131. The Transfer was not authorized by the Court.

132. Accordingly, the Transfer is avoidable pursuant to 11 U.S.C. § 549(a).

133. The Transfer occurred prior to entry of the order for relief.

134. Under 11 U.S.C. § 549(b), the Trustee may not avoid a transfer that occurred after the Petition Date but before entry of the order for relief "to the extent any value . . . is given after the commencement of the case in exchange for such transfer."

135. Lockhart paid $262,000 in exchange for the Transfer.

136. Accordingly, the Transfer is not avoidable as to $262,000 in value given, but is otherwise avoidable.

137. Under 11 U.S.C. § 550(a), the Court may grant Lockhart a replacement lien against the CC Mineral Interests in the amount of $262,000 in satisfaction of this value.

WHEREFORE, the Trustee respectfully requests that the Court enter judgment in his favor and against Lockhart, (a) avoiding the Transfer pursuant to 11 U.S.C. § 549(a); (b) authorizing, pursuant to 11 U.S.C. § 550(a), the recovery of the avoided Transfer or the value thereof from Lockhart, provided Lockhart is granted a replacement lien in the amount of $262,000; and (c) granting such other relief as the Court deems appropriate.

Dated this 30th day of November, 2015.

Respectfully submitted,

SENDER WASSERMAN WADSWORTH, P.C.

*/s/ David V. Wadsworth*
David V. Wadsworth, #32066
1660 Lincoln Street, Suite 2200
Denver, Colorado 80264
303-296-1999 / 303-296-7600 FAX
dwadsworth@sww-legal.com
Attorneys for the Plaintiff/Chapter 7 Trustee