## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

In re:                                          )
                                                )    Case No. 15-15610 MER
SUN RIVER ENERGY, INC.,                         )
                                                )    Involuntary Chapter 7
        Debtor.                                 )

---

## TRUSTEE'S MOTION FOR ENTRY OF
## (I) AN ORDER (A) APPROVING BIDDING PROCEDURES
## AND BID PROTECTIONS IN CONNECTION WITH THE SALE OF
## ESTATE ASSETS, (B) APPROVING
## THE FORM AND MANNER OF NOTICE THEREOF, (C) SCHEDULING AN
## AUCTION AND SALE HEARING, AND (D) GRANTING
## RELATED RELIEF AND (II) AN ORDER (A) APPROVING THE ASSET PURCHASE
## AGREEMENT BETWEEN THE ESTATE AND THE PURCHASER, AND
## (B) AUTHORIZING THE SALE OF ESTATE
## ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND
## INTERESTS, AND (C) GRANTING RELATED RELIEF

---

Harvey Sender, in his capacity as chapter 7 trustee ("Trustee") of the Sun River Energy, Inc. bankruptcy estate (the "Estate"), respectfully states the following in support of this motion:

### I. Jurisdiction and Venue

1.      The United States Bankruptcy Court for the District of Colorado (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and D.C. COLO. LCivR 84.1(a) of the United States District Court for the District of Colorado. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). The Trustee confirms his consent, insofar as the Court's General Procedure Order Number 2016-01 applies, to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     The bases for the relief requested herein are sections 105(a), 363, 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, and 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1, and 9013-1 of the Court's Local Bankruptcy Rules, Forms and Appendix (the "Local Rules").

## II.  Background

4.     An involuntary bankruptcy proceeding was commenced against Sun River Energy, Inc. ("Debtor') on May 21, 2015.  The Court entered an order for relief on June 17, 2015, and the Trustee was appointed on June 23, 2015.  The Debtor was an oil and gas exploration company with operations primarily located in New Mexico.  The Debtor owns mineral rights in and about Colfax County, New Mexico (collectively, the "Assets").  None of these Assets are currently producing hydrocarbons or other minerals.

5.     The Trustee has determined that a sale of the Assets would maximize the value of the estate for all stakeholders.

6.     The Trustee has embarked on an effort to market the Assets to interested alternative buyers.  The Estate's constrained cash situation and historical litigation related to the Assets has made it impractical to hire a marketing company to shepherd this process. However, the Trustee has communicated with a number of parties that have expressed some interest in pursuing the Assets.  Due to the non-operational status of the Assets, efforts were made to select potential buyers with prior experience in the area and a willingness and ability to address development.  Data related to the Assets has been made available to potential buyers.  Significant effort was expended in assisting interested parties in follow-up conversations, additional due diligence, and analysis.

7.     The Trustee's marketing efforts have now paid off.  Specifically, the Trustee and J. Bradford Smith or his Permitted Assignee, as defined in Section 17(f) of the Asset Purchase Agreement (the "Stalking Horse Bidder"), have entered into an Asset Purchase Agreement, dated

as of May 16, 2022 (including all exhibits and schedules related thereto, the "Stalking Horse Purchase Agreement"), whereby the Stalking Horse Bidder proposes to purchase the Assets for cash consideration of Five Million One Hundred Fifty Thousand and No/100 Dollars ($5,150,000.00) (the "Purchase Price").

8. The Trustee now seeks authority to market-test the transaction contemplated by the Stalking Horse Purchase Agreement (collectively, the "Stalking Horse Bid") to ensure the highest or otherwise best offer or combination of offers for the Assets. As set forth in further detail below, the sale, the Stalking Horse Purchase Agreement, the proposed bidding procedures (the "Bidding Procedures"), and the related relief requested in this Motion are in the best interests of the Estate, its stakeholders, and all other parties in interest. Accordingly, the Trustee respectfully request that the Court grant this Motion.

### III.  Relief Requested

9. The Trustee seeks entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Bidding Procedures Order"):

    (a)    authorizing and approving the Bidding Procedures attached to the Bidding Procedures Order as **Exhibit 1** and approving the Bid Protections (as defined below) in connection with the sale of the Assets;

    (b)    approving the form and manner of notice of an auction (the "Auction") and sale hearing (the "Sale Hearing") with respect to the sale of the Assets free and clear of liens, claims, encumbrances, and other interests (the "Sale"), attached as **Exhibit 2** to the Bidding Procedures Order (the "Sale Notice");

    (c)    scheduling the Auction and Sale Hearing; and

    (d)    granting related relief.

10. In addition, the Trustee will seek entry of an order at the conclusion of the Sale Hearing (the "Sale Order") seeking the following relief:

    (a)    authorizing and approving the Sale of the Assets to the Successful Bidder (as defined in the Bidding Procedures) on the terms substantially set forth in the Successful Bid;

    (b)    authorizing and approving the Sale free and clear of liens, claims, encumbrances, and other interests to the extent set forth in the Successful Bid; and

    (c)    granting any related relief.

11.     The Trustee reserves the right to file and serve before the Sale Hearing any supplemental pleading or declaration that he deems appropriate or necessary in his reasonable business judgment, including any pleading summarizing the competitive bidding and sale process and the results thereof, in support of his request for entry of the Sale Order.

## IV.  Notice

12.     The Trustee will provide notice of this Motion to: (a) the Office of the United States Trustee for the District of Colorado (the "U.S. Trustee"); (b) all creditors on the Debtor's list of creditors; (c) the United States Attorney's Office for the District of Colorado; (d) the Internal Revenue Service; (e) the Environmental Protection Agency; (f) the office of the Attorney General for the State of New Mexico; (g) the Securities and Exchange Commission; (h) counsel to the Stalking Horse Bidder; (i) the United States Bureau of Land Management; (j) the New Mexico Office of Surface Lands and Investments (or equivalent, if any); (k) the New Mexico Department of Environmental Quality (or equivalent, if any); (l)  Colfax County Commissioner; (m) the Texas Commission of Environmental Quality; (n) the Railroad Commission of Texas; (o) Tom Green County Commissioner; (p) all parties identified as secured creditors in Debtor's Schedule D filed as required by Section 521(a)(1)(A) of the Bankruptcy Code; and (m) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Trustee submits that, in light of the nature of the relief requested, no other or further notice need be given.

## V.  The Proposed Sale

**A.**     **The Proposed Stalking Horse Purchase Agreement and Contemplated Section 363 Sale.**

13.     The Trustee entered into arm's-length negotiations with the Stalking Horse Bidder to finalize mutual and agreeable terms of the Stalking Horse Bid for the Assets. The Trustee believes a prompt Sale of the Assets represents the best alternative available for all stakeholders in this Estate. Moreover, it is critical for the Trustee to execute on the proposed Sale transaction within the timeframe contemplated by the Stalking Horse Purchase Agreement.

14.     The Trustee respectfully requests that the Court approve the following general timeline:

- *Bid Deadline*: 11:59 p.m. (prevailing Mountain Time), on or before **August 26, 2022**, as the deadline by which bids for the Purchased Assets (as well as the deposit and all other documentation required under the Bidding Procedures for Qualified Bidders (as defined in the Bidding Procedures)) must be actually received (the "Bid Deadline");

- *Auction*: **September 7, 2022**, at 10:00 a.m. (prevailing Mountain Time), as the date and time the Auction, if needed, will be held at the offices of Cohen & Cohen, P.C., located at 1720 South Bellaire, Suite 205, Denver, Colorado 80222;

- *Sale Objection Deadline*: 5:00 p.m. (prevailing Mountain Time), on or before seven calendar days after the Bid Deadline, as the deadline to object to the Sale;

- *Sale Hearing*: on or before **September 13, 2022,** at 1:30 p.m. (prevailing Mountain Time), or otherwise as the Court's calendar permits, as the date and time for the Sale Hearing.

15.     The Trustee believes that this timeline maximizes the prospect of receiving a higher or otherwise better offer without unduly prejudicing the Estate. To further ensure that the Trustee's proposed Auction and Sale process maximizes value to the benefit of the Estate, the Trustee will use the time following entry of the Bidding Procedures Order to actively market the Purchased Assets in an attempt to solicit higher or otherwise better bids.

**B.**      **Material Terms of the Stalking Horse Purchase Agreement.**

16.      The following chart summarizes key terms and conditions of the Stalking Horse

Purchase Agreement (attached hereto as **Exhibit B**):[1]

| Stalking Horse Purchase Agreement Provision | Summary Description |
|---|---|
| Stalking Horse Purchase Agreement Parties (Recitals) | Sellers:  Trustee, as representative of the Estate<br><br>Purchaser: J. Bradford Smith or his Permitted Assignee, as defined in Section 17(f) of the Asset Purchase Agreement |
| Purchase Price (Section 6(a)) | Purchase Price:  The aggregate consideration for the Assets (the "Purchase Price") shall be Five Million One Hundred Fifty Thousand and No/100 Dollars ($5,150,000.00). |
| Stalking Horse Bid Protections (Section 7(c)(i)(ii)) | Breakup Fee:  A breakup fee of $250,000.00 (the "Breakup Fee"), payable in the event of a sale to a higher and better bidder.<br><br>Expense Reimbursement:  None.<br><br>Minimum Bid:  the aggregate consideration proposed by each Bid must equal or exceed the sum of (i) the Purchase Price set forth in the Stalking Horse Bid, (ii) the Breakup Fee, and (iii) $100,000.00 (the "Minimum Overbid" and together with the Breakup Fee, the "Bid Protections"). |
| Purchased Assets (Section 1) | Estate's Mineral rights in and about Colfax County, New Mexico. |
| Assumed Liabilities (Section 3) | Post-closing liabilities. |
| Assigned Contracts (Section 2(m)) | None. |
| Excluded Assets (Section 2) | The Excluded Assets listed in Section 2 of the Stalking Horse Purchase Agreement. |
| Representations and Warranties (Section 9 and 10) | Customary representations and warranties by the Trustee and the Stalking Horse Bidder. |

---

[1] This summary is provided for the convenience of the Court and parties in interest. To the extent there is any conflict between this summary and the Stalking Horse Purchase Agreement, the Stalking Horse Purchase Agreement shall govern in all respects. Capitalized terms used in the following summary have the meanings ascribed to them in the Stalking Horse Purchase Agreement or the Bidding Procedures for the sale of Estate Assets. All references to schedules or sections in the following summary refer to schedules or sections of the Stalking Horse Purchase Agreement.

| Closing and Other Deadlines (Section 15) | <u>Drop Dead Date</u>:  Ninety (90) days after entry of Bid Procedures Order. |
|---|---|
| Sale of Avoidance Actions (Section 2 (n)(k)) | The Assets exclude all Claims arising under chapter 5 of the Bankruptcy Code. |
| Requested Findings as to Successor Liability (Section 4) | All of the Assets shall be sold free and clear of all liens, interests, and other encumbrances (other than the Assumed Liabilities and Permitted Encumbrances). |
| Relief from Bankruptcy Rules 6004(h) and 6006(d) | To maximize the value received for the Assets, the Trustee is seeking to close the transactions contemplated by the Successful Bidder's Purchase Agreement as soon as possible after the Sale Hearing. The Trustee, therefore, has requested a waiver of the fourteen-day stays under Bankruptcy Rules 6004(h) and 6006(d). |

## VI.  The Bidding Procedures Order

**A.      The Bidding Procedures.**

17.      To optimally and expeditiously solicit, receive, and evaluate bids in a fair and accessible manner, the Trustee has developed and proposed the Bidding Procedures, attached as **Exhibit 1** to the Bidding Procedures Order. The following are the salient points of the Bidding Procedures.[2]

(a)      **Bid Requirements**. Any bid by an Acceptable Bidder must be submitted in writing and determined by the Trustee, in his reasonable business judgment, to have satisfied the following requirements:

(i)      ***Purchased Assets and Purchase Price***: Each Bid must be a bid to purchase all or substantially all of the Assets, and must clearly state which liabilities of the Estate the Acceptable Bidder is agreeing to assume. Each Bid must clearly set forth the Purchase Price to be paid, including and identifying separately any cash and non-cash components.

---

[2] This summary is qualified in its entirety by the Bidding Procedures attached as **Exhibit 1** to the Bidding Procedures Order. All capitalized terms used in this summary but not otherwise defined herein shall have the meanings in the Bidding Procedures. To the extent there are any conflicts between this summary and the Bidding Procedures, the terms of the Bidding Procedures shall govern.

(ii)     ***Deposit***: Each Bid must be accompanied by a cash deposit in the amount of $250,000.00, to be held in a non-interest-bearing account to be identified and established by the Trustee (the "<u>Deposit</u>").

(iii)     ***Minimum Bid***: The aggregate cash consideration proposed by each Bid must be equal to, or exceed, the sum of (i) the Purchase Price set forth in the Stalking Horse Bid; (ii) the Breakup Fee; plus (iii) the Overbid Increment.

(iv)     ***The Same or Better Terms***: Except as otherwise provided herein, each Bid must, in the Trustee's business judgment, be on terms the same as or better than the terms of the Stalking Horse Purchase Agreement. Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the transactions contemplated in the Bid (the "<u>Bid Documents</u>"). The Bid Documents shall include a copy of the Stalking Horse Purchase Agreement clearly marked to show all changes requested by the Acceptable Bidder (including those related to the Purchase Price, the Assumed Liabilities, and Assets to be acquired by such Acceptable Bidder), as well as all other material documents integral to such Bid.

(v)     ***Due Diligence***: The Purchaser has sixty (60) days to complete all due diligence from the date of the Stalking Horse Purchase Agreement.

(vi)     ***Sources of Financing***: The Bid must indicate the source of cash consideration, including proposed funding commitments and confirm that such consideration is not subject to any contingencies. The Bid should include a detailed sources and uses schedule. Further, the Bid must include reasonable evidence of sufficient funds to close the transaction.

(vii)     ***Tax Structure***: The Bid must specify with particularity its tax structure, including whether it is intended to be structured in a tax-free manner or if any incremental tax liabilities will be incurred by the Estate under the Bid.

(b)     **<u>Bid Deadline</u>**. Each bid must be transmitted via email (in .pdf or similar format) or other means so as to be actually received by the Trustee, counsel to the Trustee, the Stalking Horse Bidder, and counsel to the Stalking Horse Bidder on or before **<u>August 26, 2022, at 11:59 p.m. (prevailing Mountain Time)</u>** (the "<u>Bid Deadline</u>").

(c)     **<u>The Auction</u>**. If the Trustee does not receive a Qualified Bid (other than the Stalking Horse Bid), the Trustee will not conduct the Auction and shall designate the Stalking Horse Bidder's Qualified Bid as the Successful Bid.

(d) **Bidding Increments**. Any Overbid following the initial Minimum Overbid or following any subsequent Prevailing Highest Bid shall be in increments of $100,000.00.

(e) **Backup Bidder**. Notwithstanding anything in the Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next-highest or otherwise second-best Qualified Bid at the Auction for the Purchased Assets, as determined by the Trustee in the exercise of his reasonable business judgment, shall be required to serve as a backup bidder (the "Backup Bidder"), and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated by the Trustee (the "Backup Bid"). The Trustee shall have the discretion to hold the deposit for an additional bidder if the first and second bidders have remaining due diligence.

(f) **Highest or Otherwise Best Bid**. When determining the highest or otherwise best Qualified Bid, as compared to other Qualified Bids, the Trustee may consider the following factors in addition to any other factors that the Trustee deems appropriate: (i) the number, type, and nature of any changes to the Stalking Horse Purchase Agreement requested by the Qualified Bidder, including the type and amount of Assets sought and obligations to be assumed in the Bid; (ii) the amount and nature of the total consideration; (iii) the likelihood of the Bidder's ability to close a transaction and the timing thereof; (iv) the net economic effect of any changes to the value to be received by the Debtor's estate from the transaction contemplated by the Bid Documents; and (v) the tax consequences of such Qualified Bid.

(g) **Reservation of Rights**. The Trustee reserves his right to modify the Bidding Procedures in his reasonable business judgment in any manner that will best promote the goals of the bidding process, or impose, at or prior to the Auction, additional customary terms and conditions on the sale of the Assets.

18. Importantly, the Bidding Procedures recognize the Trustee's fiduciary obligations to maximize sale value, do not impair the Trustee's ability to consider all qualified bid proposals, and, as noted, preserve the right to modify the Bidding Procedures as necessary or appropriate to maximize value for the Debtor's estate.

**B.    Form and Manner of Sale Notice.**

19.    On or within three business days after entry of the Bidding Procedures Order, the Trustee will cause the Sale Notice to be served on the following parties or their respective counsel, if known: (a) the U.S. Trustee; (b) counsel to the Stalking Horse Bidder; (c) all parties who have expressed a written interest in some or all of the Assets; (d) all parties who are known or reasonably believed, after reasonable inquiry, to have asserted any lien, encumbrance, claim, or interest in the Assets; (e) the Internal Revenue Service; (f) all applicable state and local taxing authorities; (g) all the Debtor's other creditors; (h) the United States Bureau of Land Management; (i) the New Mexico Office of State Lands and Investments (or equivalent, if any); (j) the New Mexico Department of Environmental Quality (or equivalent, if any); (k) Colfax County Commissioner; (l) the Texas Commission of Environmental Quality; (m) the Railroad Commission of Texas; (n) Tom Green County Commissioner; (o) any other governmental agency that is known to the Trustee to be an interested party with respect to the Sale and transactions proposed thereunder; (p) all other parties who are served with notice of this Motion; and (q) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002.

20.    In addition, Trustee shall post the Bidding Procedures and Sale Order on the website for Energy Advisors Group, LLC. The Trustee respectfully submits that the Sale Notice is reasonably calculated to provide all interested parties with timely and proper notice of the proposed Sale, including: (a) the date, time, and place of the Auction (if one is held); (b) the Bidding Procedures; (c) the deadline for filing objections to the Sale and entry of the Sale Order, and the date, time, and place of the Sale Hearing; (d) a reasonably specific identification of the Assets; (e) instructions for promptly obtaining a copy of the Stalking Horse Purchase Agreement; and (f) a description of the Sale as being free and clear of liens, claims, interests, and other

encumbrances, with all such liens, claims, interests, and other encumbrances attaching with the same validity and priority to the Sale proceeds.

21.     The Trustee further submits that notice of this Motion and the related hearing to consider entry of the Bidding Procedures Order, coupled with service of the Sale Notice, constitute good and adequate notice of the Sale and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002 and Local Rules 2002-1 and 9013-1. The Trustee proposes that no other or further notice of the Sale shall be required. Accordingly, the Trustee requests that this Court approve the form and manner of the Sale Notice.

## VII.  Basis for Relief

### A.     The Relief Sought in the Bidding Procedures Order Is in the Best Interests of the Estate and Should Be Approved.

22.     A Trustee's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets. *See, e.g., In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification'" (internal citations omitted)); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (quoting *In re Schipper*); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (same); *see also In re Integrated Resources, Inc.*, 147 B.R. 650, 656–7 (S.D.N.Y. 1992) (noting that bidding procedures that have been negotiated by a trustee are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid").

23.     The paramount goal in any proposed sale of property of the estate is to maximize proceeds. *See In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564–65 (8th Cir. 1997) (in bankruptcy

sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *Integrated Resources*, 147 B.R. at 659 ("[I]t is a well-established principle of bankruptcy law that the objective of the bankruptcy rules and the trustee's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (internal citations omitted).

24.     To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions.  *See, e.g., Integrated Resources*, 147 B.R. at 659 (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

25.     The Trustee believes that the proposed Bidding Procedures will promote active bidding from seriously interested parties and will elicit the highest or otherwise best offers available for the Assets. The proposed Bidding Procedures will allow the Trustee to conduct the Sale in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who will offer the best package for the Assets and who can demonstrate the ability to close a transaction. Specifically, the Bidding Procedures contemplate an open auction process with minimum barriers to entry and provide potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

26.     At the same time, the Bidding Procedures provide the Trustee with a robust opportunity to consider competing bids and select the highest or otherwise best offer for the completion of the Sale. Entering into the Stalking Horse Purchase Agreement with the Stalking

Horse Bidder ensures that the Trustee obtains fair market value by setting a minimum purchase price for the Assets that will be tested in the marketplace. As such, creditors of the Estate can be assured that the consideration obtained will be fair and reasonable and at or above market.

27.     The Trustee submits that the proposed Bidding Procedures will encourage competitive bidding, are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings.

**B.     The Bid Protections Have a Sound Business Purpose and Should Be Approved.**

28.     The Trustee is also seeking authority to offer customary bid protections. The Trustee has agreed to pay the Breakup Fee to the Stalking Horse Bidder as an allowed administrative expense priority claim. The use of a stalking horse in a public auction process for sales pursuant to section 363 of the Bankruptcy Code is a customary practice in chapter 7 cases, as the use of a stalking horse bid is, in many circumstances, the best way to maximize value in an auction process by "establish[ing] a framework for competitive bidding and facilitat[ing] a realization of that value." *Official Committee of Unsecured Creditors v. Interforum Holding LLC*, 2011 WL 2671254, No. 11-219, *1 (E.D. Wis. July 7, 2011). As a result, stalking horse bidders virtually always require break-up fees and, in many cases, other forms of bidding protections as an inducement for "setting the floor at auction, exposing its bid to competing bidders, and providing other bidders with access to the due diligence necessary to enter into an asset purchase agreement." *Id*. (internal citations omitted). Thus, the use of bidding protections has become an established practice in chapter 7 cases.

29.     Indeed, break-up fees and other forms of bidding protections are a normal and, in many cases, necessary component of significant sales conducted under section 363 of the Bankruptcy Code: "Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets . . . . In fact, because the . . . corporation has a duty to encourage

13

bidding, break-up fees can be **necessary** to discharge [such] duties to maximize value." *Integrated Res.*, 147 B.R. at 659–60 (emphasis added). Specifically, bid protections "may be legitimately necessary to convince a 'white knight' bidder to enter the bidding by providing some form of compensation for the risks it is undertaking." *995 Fifth Ave.*, 96 B.R. at 28 (quotations omitted); *see also Integrated Resources*, 147 B.R. at 660–61 (bid protections can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid"); *In re Hupp Int'l Indus., Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("[W]ithout such fees, bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's . . . due diligence.").

30.     As a result, courts routinely approve such bidding protections in connection with proposed bankruptcy sales where a proposed fee or reimbursement provides a benefit to the estate. *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527 (3d Cir. 1999). The Trustee believes that the allowance of the Bid Protections is in the best interests of the Estate and its creditors, as the Stalking Horse Bid will establish a floor for further bidding that may increase the consideration given in exchange for the Assets for the benefit of the Estate.

31.     Here, the Bid Protections were, and remain, a critical component of the Stalking Horse Bidder's commitment. The Stalking Horse Bidder has expended and will continue to expend significant time and resources negotiating, drafting, and performing due diligence activities necessitated by the Sale transactions, despite the fact that its bid will be subject not only to Court approval, but also to overbidding by third parties. The parties negotiated the requested Breakup Fee in good faith and at arm's length. As a result, by agreeing to the Bid Protections, the Trustee ensured that the estate has the benefit of the transactions with the Stalking Horse Bidder without sacrificing the potential for interested parties to submit overbids at the Auction.

32.     If the Court does not approve the Bid Protections, the Stalking Horse Bidder may elect not to serve as the stalking horse, to the detriment of the Estate. Further, if the Bid Protections were to be paid, it will be because the Trustee has received higher or otherwise superior offers for the Assets. In short, the proposed Breakup Fee is fair and reasonable under the circumstances because it constitutes, at $250,000.00, which is 4.8% of the proposed purchase price, a "fair and reasonable percentage of the proposed purchase price." Accordingly, the Bid Protections should be approved.

## C.     The Form and Manner of the Sale Notice Should Be Approved.

33.     Pursuant to Bankruptcy Rule 2002(a), the Trustee is required to provide creditors with 21 days' notice of the Sale Hearing. Pursuant to Bankruptcy Rule 2002(c), such notice must include the time and place of the Auction and the Sale Hearing and the deadline for filing any objections to the relief requested herein.

34.     The Trustee submits that notice of this Motion and the related hearing to consider entry of the Bidding Procedures Order, coupled with service of the Sale Notice, as provided for herein, constitute good and adequate notice of the Sale and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002. Accordingly, the Trustee requests that this Court approve the form and manner of the Sale Notice.

## D.     The Sale Should Be Approved as an Exercise of Sound Business Judgment.

35.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). A sale of the debtor's assets should be authorized pursuant to section 363 of the Bankruptcy Code if a sound business purpose exists for the proposed transaction. *See, e.g., In re Martin*, 91 F.3d 389, 395 (3d. Cir. 1996) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification' . . . .");

*see also In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) (same); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Castre, Inc.*, 312 B.R. 426, 428 (Bankr. D. Colo. 2004).

36.     Once the Trustee articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making the business decision the [Trustee] of a corporation acted on an informed basis, in good faith, and in the honest belief that the action was in the best interests of the company." *In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill 1995) (citations omitted); *In re Filene's Basement, LLC*, 11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate") (citations omitted); *Integrated Res.*, 147 B.R. at 656; *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions.").

## 1.     A Sound Business Purpose Exists for the Sale.

37.     As set forth above, the Trustee has a sound business justification for selling the Assets. *First*, the Trustee believes the Sale will maximize the Assets' value by allowing a party to bid on assets that would have substantially less value on a stand-alone basis.

38.     *Second*, the sale of the Assets will be subject to competing bids, enhancing the Trustee's ability to receive the highest or otherwise best value for the Assets. Consequently, the ultimately successful bid, after being subject to a "market check" in the form of the Auction, will constitute, in the Trustee's reasonable business judgment, the highest or otherwise best offer for the Assets and will provide a greater recovery for their estates than any known or practicably available alternative. *See, e.g., In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "section 363(b) sale transaction does not require an auction

procedure," "the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").

39.     Thus, the Trustee submits that the Successful Bidder's Purchase Agreement will constitute the highest or otherwise best offer for the Assets and will provide a greater recovery for the Estate than would be provided by any other available alternative. As such, the Trustee's determination to sell the Assets through an Auction process and subsequently to enter into the Successful Bidder's Purchase Agreement will be a valid and sound exercise of the Trustee's business judgment. The Trustee will submit evidence at the Sale Hearing to support these conclusions. Therefore, the Trustee requests that the Court make a finding that the proposed sale of the Assets is a proper exercise of the Trustee's business judgment and is rightly authorized.

## 2.     Adequate and Reasonable Notice of the Sale Will Be Provided.

40.     As described above, the Sale Notice: (a) will be served in a manner that provides at least 21 days' notice of the date, time, and location of the Sale Hearing; (b) informs parties in interest of the deadlines for objecting to the Sale; and (c) otherwise includes all information relevant to parties interested in or affected by the Sale. Significantly, the form and manner of the Sale Notice will have been approved by this Court pursuant to the Bidding Procedures Order after notice and a hearing before it is served on parties in interest.

## 3.     The Sale and Purchase Price Reflects a Fair Value Transaction.

41.     It is well-settled that, where there is a court-approved auction process, a full and fair price is presumed to have been obtained for the assets sold, as the best way to determine value is exposure to the market. *See Bank of Am. Nat'l Trust & Sav. Ass'n. v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999); *see also In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, *4 (Bankr. D. Del. 2001) (while a "section 363(b) sale transaction does not require an

auction procedure," "the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").

42.     Moreover, as noted above, even as the Trustee moves forward with the Sale, he will continue to market the Assets and solicit other offers consistent with the Bidding Procedures, including, for example, by contacting previously solicited parties, continuing to provide acceptable bidders with data access and requested information, considering a variety of alternative transaction structures, and otherwise assisting the Trustee with all efforts to increase transaction value. In this way, the number of bidders that are eligible to participate in a competitive Auction process will be maximized, or, if no Auction is held because no Auction is necessary, the Stalking Horse Purchase Agreement's purchase price will, conclusively, be fair value.

### 4.     The Sale Has Been Proposed in Good Faith and Without Collusion, and the Stalking Horse Bidder or Successful Bidder Is a "Good-Faith Purchaser."

43.     The Trustee requests that the Court find the Stalking Horse Bidder and/or other Successful Bidder arising from the Auction, if any, are entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the sale of the Purchased Assets.

44.     Section 363(m) of the Bankruptcy Code provides in pertinent part:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease or property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

45.     Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the

purchased assets if the order allowing the sale is reversed on appeal, as long as such purchaser leased or purchased the assets in "good faith." While the Bankruptcy Code does not define "good faith," courts have held that a purchaser shows its good faith through the integrity of its conduct during the course of the sale proceedings, finding that where there is a lack of such integrity, a good-faith finding may not be made. *See, e.g., In re Abbotts Dairies of Pa., Inc.* ("Typically, the misconduct that would destroy a [buyer's] good faith status at a judicial sale involves fraud, collusion between the [proposed buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); *In the Matter of Andy Frain Services, Inc.*, 798 F.2d 1113 (7th Cir. 1986) (same); *In re Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) (same).

46. The Trustee submits that the Stalking Horse Bidder, or any other Successful Bidder arising from the Auction, is or would be "good faith purchasers" within the meaning of section 363(m) of the Bankruptcy Code, and the Stalking Horse Purchase Agreement, or any marked versions thereof, are or would be good-faith agreements on arms'-length terms entitled to the protections of section 363(m) of the Bankruptcy Code.[3] ***First***, as set forth in more detail above, the consideration to be received by the Trustee pursuant to the Stalking Horse Purchase Agreement is substantial, fair, and reasonable. ***Second***, the parties entered into the Stalking Horse Purchase Agreement in good faith and after extensive, arm's-length negotiations, during which all parties were represented by competent counsel, and any sale agreement with a Successful Bidder will be the culmination of a competitive Auction process in which all parties will presumably be

---

[3] The Trustee believes that a finding of good faith within the meaning of section 363(m) of the Bankruptcy Code will be appropriate for any Successful Bidder arising from the Auction. Pursuant to the Bidding Procedures, any Successful Bidder will have had to present a proposal in accordance with the Bidding Procedures. In addition, the Trustee will not choose as the Successful Bidder or Backup Bidder (as defined in the Bidding Procedures) any entity whose good faith under section 363(m) of the Bankruptcy Code can reasonably be doubted, and will be prepared to present the Court with sufficient evidence to allow the Court to find that the "good faith" standard of section 363(m) of the Bankruptcy Code has been satisfied.

represented by counsel and all negotiations will be conducted on an arm's-length, good-faith basis. **Third**, there is no indication of any "fraud, collusion between the purchaser and other bidders or the Trustee, or an attempt to take grossly unfair advantage of other bidders" or similar conduct that would cause or permit the Sale or Stalking Horse Purchase Agreement to be avoided under section 363(n) of the Bankruptcy Code. And, with respect to potential bidders, the Bidding Procedures are designed to ensure that no party is able to exert undue influence over the process. **Finally**, the Stalking Horse Bidder's offer was evaluated and approved by the Trustee in consultation with his advisors, and any other bids that the Trustee ultimately determines to be a successful bid will have been evaluated in a similar fashion. Accordingly, the Trustee believes that the Stalking Horse Bidder (or other Successful Bidder arising from the Auction, if any) and Stalking Horse Purchase Agreement (or marked version thereof) should be entitled to the full protections of section 363(m) of the Bankruptcy Code.

### 5.    The Sale Should be Approved "Free and Clear" Under Section 363(f).

47.    Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if: (a) applicable nonbankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is the subject of a bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest. *See* 11 U.S.C. § 363(f).

48.    Section 363(f) is drafted in the disjunctive. Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the Trustee's sale of the Purchased Assets free and clear of all interests (*i.e.*, all liens, claims, rights, interests, charges, or encumbrances), except with respect to any interests that may be Assumed Liabilities under the applicable Purchase Agreement. *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any

of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.").

49.     The Trustee submits that any interest that will not be an Assumed Liability satisfies or will satisfy at least one of the five conditions of section 363(f) of the Bankruptcy Code, and that any such interest will be adequately protected by either being paid in full at the time of closing, or by having it attach to the net proceeds of the Sale, subject to any claims and defenses the Trustee may possess with respect thereto. The Trustee accordingly requests authority to convey the Assets to the Stalking Horse Bidder or other Successful Bidder arising from the Auction, if any, free and clear of all liens, claims, rights, interests, charges, and encumbrances, with any such liens, claims, rights, interests, charges, and encumbrances to attach to the proceeds of the Sale.

**E.     Relief Under Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate.**

50.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise." Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise." The Trustee requests that the Sale Order be effective immediately upon its entry by providing that the fourteen-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

51.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, the leading treatise on bankruptcy suggests that the fourteen-day stay should be eliminated to allow a sale or other transaction to close immediately

"where there has been no objection to procedure." 10 *Collier on Bankruptcy* ¶ 6004.10 (15th rev. ed. 2006). Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id*.

52.     To maximize the value received for the Assets, the Trustee seeks to close the Sale as soon as possible after the Sale Hearing. Accordingly, the Trustee hereby requests that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

WHEREFORE, the Trustee respectfully requests that the Court enter the Bidding Procedures Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Dated: June 7, 2022.

> */s/ Katharine S. Sender*_____
> Katharine S. Sender, 47925
> 1720 S. Bellaire St; Ste 205
> Denver, CO  80222
> Phone: (303) 933-4529
> Fax: (866) 230-8268
> ksender@cohenlawyers.com
> *Counsel for chapter 7 trustee*